**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LAURA YASKO, o/b/o** | ) | |
| **ALAN YASKO, M.D.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12 C 02658** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge John J. Tharp, Jr.** |
| **RELIANCE STANDARD LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Laura Yasko has sued Reliance Standard Life Insurance Company ("Reliance") to recover accidental death benefits from an insurance policy issued to her husband, Dr. Alan Yasko. On August 19, 2010, Dr. Yasko died of a pulmonary embolism after traveling by air from Chicago to Mexico. Reliance denied Ms. Yasko's claim for accidental death benefits as well as an appeal of that decision in 2011. Ms. Yasko then brought suit in federal court under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1132(e)(1) and 1132(f). Reliance has moved for summary judgment. For the reasons stated below, the Court denies the motion.

## I.    UNDISPUTED FACTS

The facts set forth below are taken from the parties' Local Rule 56.1(a) & (b) statements of material fact (referred to herein as "Def. 56.1" (Dkt. 39), "Pl. 56.1" (Dkt. 42), and "Pl. 56.1 Resp." (Dkt. 42)) and exhibits, including the administrative record. The facts are largely undisputed; the material disputes are specifically identified in the discussion below.

## A.     Dr. Yasko's Group Accident Policy

Dr. Alan Yasko was employed by Northwestern University as a professor and surgeon specializing in orthopedic surgery and musculoskeletal oncology. Pl. 56.1 Resp. ¶ 6; Compl. (Dkt. 1) ¶ 8. As part of that employment, Dr. Yasko participated in Northwestern University's employee group accident policy (Group Policy No. VAR 202958), which "insures against certain accidental losses as described" in the Policy. Pl. 56.1 Resp. ¶ 6; AR 1. The Policy contains the following relevant provisions:

> Definitions … "Injury" means accidental bodily injury to an Insured which is caused directly by accidental means and which occurs while the Insured's coverage under this Policy is in force. [AR 10]
>
> Accidental Death and Dismemberment Benefit; Description of Coverage; Loss of Life, Limb, Sight, Speech or Hearing: If, due to Injury, an Insured suffers any one of the following specific Losses within 365 days from the date of the accident we will pay the Benefit Amount listed below … Loss of Life: the Insured's Principal Sum. [AR 22]
>
> "Loss(es)" must result directly and independently from Injury, with no other contributing cause. [AR 22]
>
> Coverage of Exposure and Disappearance; Description of Coverage; Exposure: Any loss that is due to exposure will be covered as if it were due to Injury, provided such loss results directly and independently of all other causes from accidental exposure to the elements which occurs while the Insured's coverage under this Policy is in force. [AR 24]
>
> Exclusions; This Policy does not cover any loss: (1) to which sickness, disease, or myocardial infarction, including medical or surgical treatment thereof, is a contributing factor. [AR 32]

## B.     Dr. Yasko's Surgery

On February 23, 2010, approximately six months before he died, Dr. Yasko underwent a CT scan of his abdomen, pelvis, and chest at Northwestern Memorial Hospital in Chicago. AR

555. The chest scan showed a "well defined lobulated mass in the superior segment left lower lobe." *Id.* The radiologist who reviewed the chest scan reported that "primary consideration would be a carcinoid tumor."[1] *Id.* at 556. On March 9, 2010, Dr. Yasko underwent a biopsy at the University of Texas M.D. Anderson Cancer Center. *Id.* at 202. The pre-biopsy diagnosis was "left lung mass" and the post-biopsy diagnosis was "left lung mass with endobronchial component." *Id.* A March 22, 2010, radiology report stated that Dr. Yasko was "recently diagnosed [with] carcinoid tumor of the left lower lobe, staging exam to evaluate for metastatic disease."[2] *Id.* at 180. The report added that a "lobulated mass measuring approximately 4.4 x 3.4 cm is identified." *Id.* The report continued, "Overall, there are no sites of abnormal metabolic activity to suggest active metastatic disease." *Id.* The report concluded that "a medial left lower lobe mass representing known carcinoid tumor demonstrates relatively mild abnormal metabolic activity" and further concluded that there was "[n]o evidence of metastatic disease." *Id.*

On March 23, 2010, Dr. Yasko underwent surgery—a left thoracotomy, lower lobe sleeve lobotomy, and mediastinal lymph node dissection—at the M.D. Anderson Cancer Center. *Id.* at 582. The preoperative diagnosis was a "left lower lobe carcinoid" and the postoperative diagnosis was the same. *Id.* There were no complications during the surgery. *Id.* at 584. A clinical note reports that "The surgical pathology revealed a 7.0 x 4.5 x 2.5 cm well-

---

[1] A "carcinoid tumor" is a "usually small, slow-growing neoplasm composed of islands of rounded, oxyphilic, or spindle-shaped cells of medium size, with moderately small vesicular nuclei, and covered by intact mucosa with a yellow cut surface." STEDMAN'S MEDICAL DICTIONARY 2051 (28th ed. 2006).

[2] "Metastatic," or "metastasis," is "The spread of a disease process from one part of the body to another, as in the appearance of neoplasms in parts of the body remote from the site of the primary tumor." STEDMAN'S MEDICAL DICTIONARY 1195.

differentiated neuroendocrine carcinoma[3] (carcinoid tumor) … 1/13 lymph nodes were positive for metastasis." *Id.* at 192. Reliance points to this clinical note as evidence that Dr. Yasko was "diagnosed with T2 lung cancer." Def. 56.1 ¶ 15. Ms. Yasko denies this conclusion, asserting instead that the "impression" was a carcinoid tumor and that the clinical note did not include a diagnosis for "T2 lung cancer." Pl. 56.1 Resp. ¶ 15.

A discharge summary states:

> Prognosis: The patient has an excellent prognosis for satisfactory convalescence after discharge … The patient was instructed to follow up in the Thoracic Surgery Outpatient Clinic … 4 weeks after discharge. At that point, [the physician] will obtain a new chest x-ray posterior, anterior, and lateral. [AR 194]

A social work note reports:

> Patient states that upon hearing his cancer diagnosis, "it was a rough week." Wife admits that patient's professional role as a cancer surgeon makes patient/wife feel at times that they know too much. Wife states that since surgery, they feel more relieved as they have a better understanding of what patient is facing. [Patient/wife] plan to reveal patient's cancer diagnosis to the[ir] children later today now that they have more information about the diagnosis/prognosis.

AR 196.

Four weeks after the surgery, Dr. Yasko was examined again at M.D. Andersen. A report from that visit, on April 23, 2010, states:

> We would like to continue surveillance. He will return in 6 months with a CT chest. At his 1 year anniversary, he will undergo a fiberoptic bronchoscopy to evaluate the anastomosis. [Dr. Yasko] has been encouraged to continue to increase his activity levels … He is to contact me should he have any difficulties in the interim.

---

[3] "Carcinoma" is "Any of various types of malignant neoplasm derived from epithelial cells … the most commonly occurring kind of cancer." STEDMAN'S MEDICAL DICTIONARY 307.

*Id.* at 192-93.

### C.     Dr. Yasko's Death

Slightly less than five months after his surgery, Dr. Yasko traveled from Chicago to Houston and then on to Mexico to attend a medical conference. Pl. 56.1 Resp. ¶ 18. He arrived in Houston on August 16, 2010, and departed two days later. *Id.* He arrived in Mexico at approximately 4 p.m. on August 18 after a flight that was less than two and a half hours in length. *Id.* According to Carlos E. Cuervo Lozano, a physician who greeted Dr. Yasko when he arrived in Mexico, Dr. Yasko "appeared tired, was sweating and immediately went to his hotel room … to rest." AR 121. Lozano further wrote that at approximately 5 a.m. on August 19, he was summoned to Dr. Yasko's hotel room. *Id.* For 15-20 minutes, Dr. Yasko was

> experiencing heavy and labored breathing, an elevated pulse and was sweating profusely. An ambulance was called shortly after my arrival. But approximately 10 minutes before the ambulance arrived he stopped breathing, so I performed cardiopulmonary resuscitation on Dr. Yasko to no avail.

*Id.*

Dr. Yasko died at the Hospiten Hospital in Playa Del Carmen, Quintana Roo, Mexico as a result of a massive pulmonary thromboembolism. Pl. 56.1 Resp. ¶ 20. The parties dispute whether lung cancer or Dr. Yasko's March 2010 surgery were contributing factors to his death. *Id.* No autopsy was performed. *Id.* ¶ 22. Dr. Yasko's Mexican death certificate states that his cause of death was massive pulmonary thromboembolism and secondarily lists under contributing causes "cancer pulmonar," that is, lung cancer. AR 504.

### D.     Pulmonary Embolism

Pulmonary embolism occurs when a blood clot (or more than one) within blood vessels break free (at this point it is called a venous thrombus) and floats in the moving blood stream into the lungs, where it can become lodged in the small blood vessels that are located there. *See*

"Chapter 16, Pulmonary Embolism" in BREATHING IN AMERICA: DISEASES, PROGRESS, AND HOPE 165 (American Thoracic Society 2010); STEDMAN'S MEDICAL DICTIONARY 626-27, 1355, 2092.[4] There are several risk factors for pulmonary embolism, including advanced age, prolonged immobility, surgery, trauma, malignancy, pregnancy, estrogen therapy, congestive heart failure, and inherited or acquired defects in blood coagulation. *Id.* at 166.

### E. Procedural History

On January 28, 2011, Laura Yasko, Dr. Yasko's wife and the sole beneficiary of his accidental death policy, submitted a claim with Reliance for $1,000,000. Pl. 56.1 Resp. ¶ 24. She claimed that Dr. Yasko's death was due to "air travel causing pulmonary embolism." *Id.* (citing claim form at AR 612). Reliance denied Ms. Yasko's claim on July 15, 2011, concluding that "all the medical records we received indicate lung cancer was a contributing factor in [Dr. Yasko's] death. Because lung cancer is a sickness and/or disease and because it contributed to Mr. Yasko's death, the above exclusion applies and no benefit is payable …." *Id.* ¶ 26. Ms. Yasko appealed the denial on September 8, 2011; Reliance affirmed its denial on January 26, 2012. *Id.* ¶¶ 27, 31. On April 11, 2012, Ms. Yasko filed the instant action in federal court.

### II. ANALYSIS

Summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Since Reliance has moved for summary

---

[4] *Breathing in America* is available at www.thoracic.org/education/breathing-in-america/index.php (last visited June 18, 2014). The American Thoracic Society published the book in 2010 to "explore[] the nature and causes of pulmonary, critical care and sleep disorders, their prevalence and burden, the benefits research has brought and the research challenges that remain." The book was supported by the National, Heart, Lung, and Blood Institute and was "written for education laypersons" as a "compilation of basic facts."

judgment, the Court views the facts in the light most favorable to Ms. Yasko, the nonmoving party, and draws reasonable inferences in her favor. *See Tebbens v. Mushol*, 692 F.3d 807, 815 (7th Cir. 2012) (citing *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 653 (7th Cir. 2010)).

The parties agree that under ERISA, which applies to this action, judicial review of a plan administrator's benefit determination is *de novo*, meaning the Court is to make an independent decision about benefits. *See Krolnik v. Prudential Ins. Co. of America*, 570 F.3d 841, 842 (7th Cir. 2009) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)) (noting that where the parties agree to this standard, the Court will not look behind that agreement). Based on this standard, the Court "can and must come to an independent decision on both the legal and factual issues that form the basis of the claim." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (noting that "[w]hat happened before the Plan administrator or ERISA fiduciary is irrelevant.").

Reliance seeks summary judgment on two bases: (1) Dr. Yasko's death was not accidental; and (2) even if Dr. Yasko's death was accidental, it was not caused directly by accidental means without any contributing causes. Where the insurer has moved for summary judgment, the Court must determine, based on all of the undisputed evidence in the record, whether it can be said as a matter of law that Ms. Yasko is not entitled to accidental death benefits under the terms of the Reliance Policy. "A claim for benefits under an ERISA-governed plan is a matter of contract interpretation. When there are no triable issues of fact … contract interpretation is a subject particularly suited to disposition by summary judgment." *Bechtold v. Physicians Health Plan of N. Ind., Inc.*, 19 F.3d 322, 325 (7th Cir. 1994). That is because "[t]he interpretation of an unambiguous contract is a question of law for the court." *Id.* at 325. "A term is [only] ambiguous if it is subject to reasonable alternative interpretations." *Id.* Further, federal

principles of contract construction apply to a court's review of an ERISA plan. *See Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005).[5] "Under these rules, a document should be read as a whole with all its parts given effect, and related documents must be read together." *Id.* The Court must "interpret the terms of the policy in an ordinary and popular sense, as would a person of average intelligence and experience" and "construe all plan ambiguities in favor of the insured." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citations omitted); *see also Sellers v. Zurich Am. Ins. Co.*, 627 F.3d 627, 632 (7th Cir. 2010) (citations omitted) ("the construction of the term 'accident' should be left to 'common understanding as revealed in common speech.'").

For the following reasons, the Court denies Reliance's motion on both grounds.

### A. Dr. Yasko's Death was an Accident under the Reliance Policy.

Reliance first argues that Dr. Yasko's death—which the parties agree was primarily caused by a pulmonary embolism—was not an "Injury" under the Reliance Policy. On that basis, Reliance contends, Ms. Yasko is not entitled to accidental death benefits. Ms. Yasko contests this conclusion, arguing in response that Dr. Yasko's death was an accident under the policy's terms.

The Policy defines "Injury" as "an accidental bodily injury to an Insured which is caused directly by accidental means …." AR 10. If, due to an injury, the insured loses his life, the insured's principal sum is to be paid to a beneficiary. *Id.* at 22. The word "accidental" is not defined in the Policy itself, but the Seventh Circuit has endorsed the following definition:

> [F]or death under an accidental death policy to be deemed an accident, it must be determined (1) that the deceased had a subjective expectation of survival, and (2) that such expectation

---

[5] By its terms, the Reliance Policy is governed by Illinois law. Because this claim arises under ERISA, however, state laws governing insurance policy interpretation are preempted. *See Hammond v. Fidelity and Guar. Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir. 1992).

> was objectively reasonable, which it is if death is not substantially
> certain to result from the insured's conduct.

*Santaella,* 123 F.3d at 463 (citing *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1456 (5th Cir. 1995)).

*See also Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1110 (7th Cir. 1998) (a result is accidental where the insured did not believe that the result would occur and that expectation was reasonable).

Reliance argues that Dr. Yasko was aware of the risk of embolism and that he "would not have reasonably believed that the embolism would not occur" because he was a surgeon, he "was fully aware of his diagnosis of T2 lung cancer and recent resection of the associated tumor as well as of his obesity and advanced age," and because he "specifically avoid[ed] the long haul flight from Chicago to Mexico by scheduling a two day layover in Houston." Def. Br. at 7.

This analysis fails on both the subjective and objective levels. To the extent that Reliance is attempting to argue that Dr. Yasko did not subjectively expect to survive his trip to Mexico, it confuses knowledge of objective risk factors with a subjective expectation that such factors would inevitably be realized. As Thoreau wrote in *Walden,* "If a man is alive, there is always *danger* that he may die." That Dr. Yasko was potentially aware of certain risk factors does not mean that what happened to him was expected; risks are inherent in life. No evidence has been adduced that Dr. Yasko subjectively believed he was unlikely to survive his flight to Mexico for a medical conference—and why would he have gone were that the case? There is no basis to conclude that Dr. Yasko was seeking, or indifferent to, his own demise; indeed, to the extent that he may have taken precautions to reduce the risk of embolism—*i.e.*, by breaking his flight into two segments by means of a two-day layover in Houston—that would only confirm that his

intent was to *survive* rather than surrender.[6] Moreover, had Dr. Yasko subjectively believed that he faced a substantial risk of death by embolism, it is utterly implausible that he would not have sought treatment when he began experiencing symptoms upon arrival in Mexico rather than simply going to his hotel room to rest overnight.

As to whether his conduct was objectively reasonable, not even Reliance argues that Dr. Yasko's death was "substantially certain to result" from his air travel to Mexico. Rather than satisfy this standard, Reliance attempts to lower it. Reliance posits that to establish that Yasko's conduct was objectively unreasonable, it need only show that Yasko could not have reasonably ruled out the possibility of an embolism (Yasko "would not have reasonably believed that the embolism would not occur"). The Seventh Circuit standard imposes a higher burden on the insurer, however, requiring a showing that an embolism was "substantially certain" to occur in order for Yasko's conduct to be deemed objectively unreasonable. *See Santaella*, 123 F.3d at 463. Reliance has not adduced evidence that the combination of risk factors it alleges—assuming them to be such for purposes of this discussion—would elevate risk to a level approaching substantial certainty. In *Santaella*, another case involving the issue of whether the insured's death was accidental, the Seventh Circuit found that the record did not suggest that the decedent had any reason to know that a seizure two months earlier made the ingestion of drugs she took on the day of her death an "unreasonable risk of death or serious injury." 123 F.3d at 464. Similarly, Dr. Yasko had no reason to know that he was particularly at risk of a pulmonary embolism, if he was in fact at risk. Those risk factors—age, moderate obesity, *et cetera*—did not make his decision to fly on an airplane on the day before his death an "unreasonable risk of death or

---

[6] So far as the record reflects, the reason for Dr. Yasko's stop in Houston is a mystery. It is purely speculation that he stopped in Houston to reduce the risk of embolism.

serious injury." Certainly his age and weight could not have increased his risk by much—overweight middle-aged men are known to fly in large numbers—and Reliance provides no data to assess the increased risk of embolism attending airline passengers five months removed from cancer surgery. And there is, in any event, record evidence—in the form of the opinions offered by Dr. Jesse Hall, the plaintiff's expert and a pulmonary specialist,[7] that it was not objectively unreasonable for Dr. Yasko to fly to Mexico. Hall Dep. at 23-24.

Applying *Santaella*'s definition of an accident, Dr. Yasko had a subjective expectation of survival and that expectation was objectively reasonable, meaning death was not substantially certain to result from his decision to fly to Mexico. 123 F.3d at 463. Reliance points to *Senkier v. Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050 (7th Cir. 1991) for the proposition that not all unexpected deaths are accidents, but the case does not support Reliance's argument. In *Senkier*, the Seventh Circuit held that a medical mishap—the piercing of a patient's heart by a loose catheter—was not an accident because although the patient did not expect the result, that is the case for *any* death. "Accident," the court wrote, "is used to carve out physical injuries not caused by illness from those that are so caused." *Id.* at 1052. Reliance argues that death from an embolism is death from a disease, Br. at 4, but its own expert disputed that notion, admitting that Dr. Yasko's "death was not the result of the progression of an identifiable disease." Pl. 56.1 Resp. ¶ 35; Holland Dep. at 23:5-7. Reliance's assertion that embolism is a disease is also at odds with *Senkier*, which posited an embolism resulting from a twisted knee as a paradigmatic death by accident rather than by disease. 948 F.2d at 1052 ("It would be different if he twisted his knee playing tennis and the injury caused blood clots that embolized to his lungs and killed

    [7] At the time of his deposition, Dr. Hall was a Professor of Medicine, Anesthesia, and Critical Care at the University of Chicago and Section Chief of Pulmonary and Critical Care Medicine at the University of Chicago Medical Center.

him ... Then the means of death—the injury to the knee—would be an accident, and the death would be covered."). It is no more a death by disease if an embolism occurs as the result of immobility resulting from the constrictions of modern airline seats or falling asleep in an awkward position on a chaise lounge on the back porch for several hours.

The argument that death by embolism is an accidental death under the Policy is reinforced by the additional language that provides for "Coverage of Exposure and Disappearance." That provision states that "[a]ny loss that is due to exposure will be covered as if it were due to Injury, provided such loss results directly and independently of all other causes from accidental exposure to the elements …." AR 24. If "accidental exposure to the elements" is covered by the Reliance Policy, it follows that exposure to high altitudes while flying should be covered, as well, either as an example of "accidental exposure to the elements," or at least as an analogous scenario. *See Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010) (noting that contracts must be read as a whole, and the meaning of separate provisions should be considered in light of one another and the context of the entire agreement).

The question of whether a pulmonary embolism after flying could fall either directly or by analogy under the Reliance Policy's exposure clause was answered by the physician Reliance retained to review Dr. Yasko's death, Dr. Michael Holland.[8] Holland opined in his report:

> ***The development of a VTE after air travel is an unfortunate consequence of the environmental exposure that people with other risk factors for VTE experience.*** An analogy would be heat exhaustion from exercising in hot humid weather on people with pre-disposing conditions of poor physical conditioning and lack of acclimation would be.

---

[8] At the time of Dr. Holland's deposition, he worked as a clinical physician at Glen Falls Hospital in upstate New York and at the nearby Poison Control Center. Holland Dep. (Dkt. 42-1) at 6.

AR 96 (emphasis added). Dr. Holland's opinion was offered to rebut the notion that Dr. Yasko's death was accidental, but what is "accidental" is a question of policy language and here the Policy includes within the ambit of "Injury" losses due to "exposure to the elements." The Court agrees with Dr. Holland.[9] The Reliance Policy allows for coverage of death from exposure. Death from a pulmonary embolism after flying at a high altitude is at least analogous to, for example, death from hypothermia after exposure to extremely cold temperatures or death from heat stroke after exposure to extremely hot temperatures. All three examples involve exposure to atmospheric conditions—temperature or pressure—that are out of the ordinary.[10] And in all three examples, the individual suffers from an internal event after being exposed to the unusual condition, even if others exposed to the same conditions do not suffer the same fate. Given that there is no language in the Reliance Policy that explicitly removes pulmonary embolism or other injuries attributable to airplane flights from coverage, the Court finds that Dr. Yasko's pulmonary embolism after flying was an "Injury," and therefore an "accident," under the Policy's terms.

Reliance makes a robust effort to dispute the idea that death after an uneventful flight of only two and a half hours could ever be an accident covered by its policy. It relies heavily on *McAuley v. Federal Insurance Co.*, where a district court granted summary judgment for an

---

[9] In its brief, Reliance quotes Dr. Holland's discussion of the "Guide for Manner of Death Classification for Medical Examiners," which states that "life consists of having a realm of natural conditions imposed by the weather and the environment …." Def.'s Br. at 9. Reliance argues that Dr. Yasko's death was therefore "natural" without reference to the exposure clause in its own policy, which states that exposure (akin to "natural conditions imposed by the weather and the environment") actually constitutes a covered injury under the Policy.

[10] Under standard operating conditions, for example, commercial flights in the United States maintain cabin pressurization equivalent to an altitude of 8,000 feet above sea level—substantially lower pressure than Dr. Yasko experienced at Chicago's altitude of about 600 feet above sea level. *See* 14 C.F.R. § 25.841(a).

insurer on the ground that a pulmonary embolism after flying is not an accident, and concluded that the policy clause covering exposure to the "elements" "refer[ed] to wind, cold, sun, and the like—not … to all the conditions one encounters in an airplane cabin."). Although the Eighth Circuit affirmed the district court's interpretation of the policy as reasonable, it questioned the district court's rejection of the plaintiff's interpretation of the exposure clause, noting that the court's "determination that 'exposure to elements' is limited to 'wind, cold, sun, and not sitting in an airplane seat' may be a reasonable, though extremely narrow reading of that clause, we note that 'elements arising from a covered hazard' may also be open to other fair interpretations including, for instance, consideration of cabin-related risk factors such as those that cause hypobaric hypoxia, which condition may or may not lead to the formation of blood clots." *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 788 n.4 (8th Cir. 2007).

The district court in *McAuley*, and Reliance, rely heavily on cases arising under Article 17 of the Warsaw Convention, including *Air France v. Saks*, 470 U.S. 392 (1985), in which the Supreme Court held that airlines were only liable under the Warsaw Convention "if a passenger's injury is caused by an unexpected or unusual event or happening that is *external* to the passenger," and not where "the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." *Id.* at 405-06 (emphasis added). *See, e.g., Rodriguez v. Ansett Australia Ltd.*, 383 F.3d 914, 919 (9th Cir. 2004) (passenger's development of deep vein thrombosis, resulting in a pulmonary embolism, was not an accident within meaning of Warsaw Convention); *Blansett v. Continental Air., Inc.*, 379 F.3d 177, 182 (5th Cir. 2004) (airline's failure to warn of deep vein thrombosis was not an accident under the Warsaw Convention). The limitations imposed by the Warsaw Convention, however, have no bearing on the interpretation of the insurance contract in this case in any event, and

14

particularly not where private parties have adopted different language, and a different risk-ordering, than is reflected in the treaty. Reliance *could* have negotiated to exclude coverage for some or all occurrences that would not result in an airline's liability under the Warsaw Convention, but it did not do so (at least not successfully). Instead, it included policy provisions—like the exposure provision—that regulate liability in ways that the treaty does not.

The Court notes as well that Ms. Yasko recently lost her motion for summary judgment in a separate lawsuit for accidental death benefits related to Dr. Yasko's death. *Laura Yasko v. Standard Insurance Co.*, Case No. 12 C 2661 (N.D. Ill.). In that case, Ms. Yasko sought benefits under a policy issued by Standard Insurance Company. In deciding cross-motions for summary judgment, the court (Schenkier, J.) granted Standard's motion, denied Ms. Yasko's motion, and entered judgment in favor of Standard.

The ruling in *Standard Insurance*, however, is distinguishable. Unlike this Court, which is applying a *de novo* standard of review, the court in the *Standard* litigation was required to apply the arbitrary and capricious standard in its review of Standard's denial of Ms. Yasko's claim because the Standard policy gave discretionary authority to its plan administrator. *See* Mem. Op. and Order (May 19, 2014) at 10. Thus, the court did not make its own assessment of the policy language; rather, it held only that the plan administrator's interpretation of the policy provisions governing accidental death as excluding coverage for Dr. Yasko's death was not "downright unreasonable" and it was "within the range of reasonable interpretations" (a range that the Court also found included Ms. Yasko's interpretation) when Standard concluded that Dr. Yasko's death was "not the consequence of an accident, as required by the language of its coverage clause." *Id.* at 19, 23. The Standard policy, moreover, does not contain (or at least the

opinion does not refer to) an "exposure" provision that expressly includes death from "exposure" to the scope of an accidental injury.

Which brings us to a final, and in the end, decisive, point. While the parties' respective interpretations of the Policy are each reasonable, that establishes that the Policy is ambiguous on this point. That ambiguity must be construed against Reliance, the drafter of the Policy, and in favor of Yasko, the insured. *See Tranzact Tech., Ltd. v. Evergreen Partners, Ltd.*, 366 F.3d 542, 546 n.2 (7th Cir. 2004) (under the doctrine of *contra proferentem*, ambiguous terms in a contract are to be construed against the drafter); *Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407, 411 (7th Cir. 1996) (courts interpret an ambiguous term in an insurance contract in favor of the insured, including in ERISA context). If Reliance wished to exclude coverage for accidental death from a pulmonary embolism, it could have simply expressed that intent unambiguously in the contract. Reliance instead drafted a policy in which the word "accident" is ambiguous. The Court therefore concludes that Dr. Yasko's death should be construed as an "Injury"—*i.e.,* accidental death—under the Policy terms and Reliance's motion for summary judgment therefore fails on that point.

### B. Reliance Has Not Met Its Burden that the Contributing Factor Exclusion Applies as a Matter of Law.

The Reliance Policy contains certain exclusions, including one that denies coverage for "any loss … to which sickness, disease, or myocardial infarction, including medical or surgical treatment thereof, is a contributing factor." AR 32.[11] The parties dispute whether this exclusion

---

[11] The Policy also excludes "any loss … caused by or resulting from riding in, getting into or out of any aircraft" but this exclusion does *not* apply if the Insured is a passenger "in a tested and approved civilian aircraft being operated as passenger transport in compliance with the then current rules of the authority having jurisdiction over its operation" and the passenger does not own, lease, or operate the aircraft. AR 32. Reliance does not contend that this exclusion would bar coverage for Dr. Yasko's death. AR 32.

bars coverage for Dr. Yasko's death. Reliance has the burden of proving that the exclusion applies, and it has not met its burden as a matter of law. *See Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010) (stating burden of proof).

### 1. Reliance's Position

Reliance argues that Dr. Yasko's lung cancer, his March 2010 surgery, and various other risk factors were contributing factors in his death, and therefore his death is excluded from the policy's coverage.[12] Reliance bases its position on several sources. First, the death certificate issued for Dr. Yasko in Mexico includes a handwritten note stating "cancer pulmonar," or lung cancer, under "Causas de la Defunción" ("Causes of Death"), "Parte II," "Otros estados patologicos significativos que contribuyeron a le muerte, pero no relacionados con la enfermadad o estado mortoso que la produjo," which roughly translates to "Other significant pathological conditions that contributed to his death but are not related to the disease or disease state that produced it." AR 504.[13] Second, Dr. Oscar Hernandez Gea, a physician at Hospiten Hospital in Playa del Carmen Mexico, told an investigator hired by Reliance that he treated Dr. Yasko "for a couple of hours in the Emergency Room and he believes that the long trip and the

---

[12] In its argument that Dr. Yasko's death was not accidental, Reliance argues that a pulmonary embolism is itself a "disease process" and not an "accidental bodily injury." Def. Br. at 6. As noted, Reliance's own expert, Dr. Holland, rejected that view. Further, Reliance does not make this argument in its discussion of the exclusion clause; in other words, Reliance does not argue that the contributing factor exclusion applies because a pulmonary embolism *itself* is a "disease" that is excluded from the Policy's coverage. Instead, Reliance argues that it "correctly concluded that Dr. Yasko's death was contributed to by a sickness or disease – his lung cancer – and in all events, was not caused directly by an Injury without any contributing causes." Def. Br. at 11; *see also* Def. Reply at 2 ("Plaintiff also does not … point to anything … raising a question of fact relative to Dr. Yasko's death being contributed to by sickness and disease, specifically Dr. Yasko's T2 lung cancer, and the surgical treatment thereof.").

[13] Unfortunately, Reliance has not submitted to this Court a certified translation of the Mexican death certificate that Reliance included in the administrative record. This shortcoming in the evidentiary record is further ground to reject Reliance's argument to the extent that it is premised on the death certificate.

insured's illness of Lung Cancer of six months produced the Massive Pulmonary Embolism and

his death." AR 487. Third, Dr. Holland, the physician retained by Reliance to assess the cause of

Dr. Yasko's death, opined that

> It should be noted [] that no autopsy was performed on Dr. Yasko,
> so it is impossible to be absolutely certain that massive pulmonary
> embolism actually caused his death, although it is probably the
> most likely cause, given his known risk factors for the disease that
> Dr. Yasko had … [C]ase reports suggest that most cases of travel-
> related thrombosis affected people at risk because of previous VTE
> or other predisposing factors. Of these known risk factors, Dr.
> Yasko had several, including the carcinoma (malignancy), prior
> major surgery, obesity (Dr. Jesse Hall listed him as BMI of 31),
> and age of 51 years … Even though his major surgery was 5
> months prior, it likely increased his risk factors by some degree at
> that point in time … Alan Yasko's death was not due to an
> accident, independent of other causes. There was no autopsy … but
> the presumed cause was the medical condition pulmonary
> embolism; there is no evidence of an accident or injury involved in
> this case. This indicates the death was due to a 'sickness, disease
> … [which was] … a contributing factor.

AR 94-96. Reliance also points out that the April 23, 2010, clinical note, which summarizes

March 23, 2010 results, reported that "1/13 lymph nodes were positive for metastasis," AR 192,

suggesting to Reliance that Dr. Yasko's cancer had metastasized and was not in remission when

he flew to Mexico. Accordingly, Reliance contends, cancer and Dr. Yasko's surgery were

contributing causes of his death.

### 2.    Ms. Yasko's Position

Ms. Yasko disputes Reliance's assertion that Dr. Yasko had lung cancer and that the lung

cancer, March 2010 surgery, and/or other risk factors contributed to his death.

First, Ms. Yasko points out that a risk factor is not the equivalent of a "contributing

cause" or "contributing factor," which is the language used in the policy. Pl.'s Br. (Dkt. 41) at 9.

Second, Ms. Yasko claims that Dr. Yasko was diagnosed in March 2010 with "a carcinoid lung tumor which was successfully treated with surgery, after which there was no recurrence or residual symptoms." Pl.'s Br. at 1-2. She attempts to diminish the reliability of Dr. Yasko's death certificate and Dr. Gea's statement by noting that neither represents an informed opinion, especially given that there was no autopsy performed. *Id.* at 8. Further, Ms. Yasko points to Dr. Holland's deposition testimony, in which he testified that "usually the surgical risk is in the first three months after surgery … [i]t's the highest risk after three months and whether five months later he still has an increased risk due to that chest surgery, that may be debatable … I'm not sure if there's any residual increased risk because of the surgery, but I think that's probably true that it has less of an effect after three months." *Id.* at 9; Holland Dep. at 19:8-13, 22:16-19. Ms. Yasko also denies that a benign tumor would ever be a risk factor in the development of thromboembolism. Pl. 56.1 Resp. ¶¶ 23, 25.

As mentioned above, Ms. Yasko retained a physician, Dr. Hall, to conduct a review of Dr. Yasko's medical records. Dr. Hall, a professor of pulmonary medicine at the University of Chicago (*i.e.,* a specialist in pulmonary embolism), found that the "tumor proved to be a benign carcinoid with no evidence of spread to lymph nodes and no residual tissue remaining after lobectomy. After routine post-operative recovery, Dr. Yasko was considered cured of this problem with no residual effect upon his health." AR 443-44.[14] Dr. Hall concluded that, in his opinion, "held to a reasonable degree of medical certainty … Dr. Yasko did indeed die of massive pulmonary embolus … but that this event was not related to underlying lung cancer." *Id.*

---

[14] Dr. Hall testified at his deposition that "[T]he cancer that Dr. Yasko had, first, is not malignant. It's a benign tumor. So the entire connection of malignancy with venous thromboembolism does not exist …." Hall Dep. (Dkt. 40-12) at 17. He added that "the pathology at the M.D. Anderson, the lymph node findings, the lack of invasion, the histology of the tumor and its complete removal all affirm that this was a benign carcinoid tumor." *Id.* at 17-18.

at 444. He added that "[t]he lung tumor that Dr. Yasko had resected approximately five months prior to his death was a benign growth and this long after surgery would have no effect on his predisposition to develop pulmonary embolism. Rather the risk for this event was his prolonged airline travel, coupled to his age and body weight …." *Id.*[15]

### 3. Reliance Has Not Met Its Burden As A Matter of Law

Reliance has not presented sufficient evidence to show that Dr. Yasko's tumor and/or his surgery to remove the tumor were contributing causes of Dr. Yasko's death. Consequently, Reliance has not met its burden to show that the contributing factor exclusion in the policy applies.

As to whether Dr. Yasko had lung cancer in the first place, the evidence leans strongly toward the conclusion that after his surgery, Dr. Yasko did not have active lung "cancer;" *i.e.*, he did not have an active malignancy. Although Dr. Yasko himself likely believed that he had some form of "cancer" in March 2010, based on the social worker's notes that he and his wife "plan[ned] to reveal" his "cancer diagnosis to the[ir] children," there is no evidence that Dr. Yasko continued to have, or believed he continued to have, an active, malignant form of cancer after his surgery. AR 196; Hall Dep. at 17. The only evidence of any ongoing malignancy is a single report dated April 23, 2010, summarizing March 23, 2010 results, and indicating 1 of 13 lymph nodes showed metastasis. AR 192. Yet that evidence is contradicted by a substantial amount of other evidence. For example, a March 23, 2010, clinical note reports: "The patient has an excellent prognosis for satisfactory convalescence after discharge." AR 194. The note also

---

[15] Dr. Hall testified at his deposition that "surgery[,] which can be a risk factor for venous thromboembolism[,] is so during most particularly the days after surgery onto the weeks and with diminishing influence as weeks become months … Five months is plenty of time to heal your wounds." Hall Dep. at 18-19.

includes an instruction to follow up in the Thoracic Surgery Outpatient Clinic four weeks later for a new chest x-ray. *Id.* At that visit, on April 23, 2010, a clinical note reports a plan to "continue surveillance," including a chest scan after six months and a bronchoscopy after one year. *Id.* at 192. Nowhere in the record is continued malignancy (as a reality, not a risk) mentioned.

In any event, Reliance has not presented evidence that demonstrates that the one lymph node showing metastasis actually "caused," or contributed to, Dr. Yasko's pulmonary embolism. Reliance has also not offered any evidence of the mechanism by which cancer can cause an embolism, or that this mechanism actually occurred in Dr. Yasko's case. *See* Hall Dep. at 20 ("The way in which cancer leads to a predisposition for venous thromboembolism is it shifts the coagulation system … Nonmalignant carcinoid tumors don't do it at all."). Instead, Reliance depends on Dr. Yasko's various risk factors for embolism, but—again—evidence that something is a risk factor does not mean that it *caused* a medical event. Risk implies, at most, correlation, not causation.

Nor do the death certificate issued in Mexico and the observations of the emergency room physician in Playa del Carmen help Reliance to demonstrate that lung cancer was a contributing cause of Dr. Yasko's death. No autopsy was performed on Dr. Yasko and no physician in Mexico had any familiarity with the status of Dr. Yasko's lung cancer. There is simply no evidentiary basis to credit these statements of opinion.

As to whether Dr. Yasko's surgery was a contributing "cause" of his death, Reliance's expert, Dr. Holland, conceded that he was "not sure" whether a surgery five months prior to a pulmonary embolism even increases the risk, let alone "causes," a pulmonary embolism. Holland Dep. at 19, 22. Holland added that it was "probably true that [the surgery] has less of an effect

after three months." *Id.* This testimony falls well short of creating a disputed issue of fact about the effect of Dr. Yasko's surgery; indeed, in view of his concession that it is "probably true" that the effect of the surgery had diminished after three months, Dr. Holland's testimony almost compels the conclusion that, as a matter of law, the surgery was not a contributing cause of Dr. Yasko's death.

Thus, Reliance has not met its burden to show that the contributing cause exclusion applies as a matter of law and its summary judgment motion on the exclusion ground also fails.

*       *       *

For the reasons set forth above, the defendant's motion for summary judgment is denied.

Entered: June 30, 2014

_____
John J. Tharp, Jr.
United States District Judge